UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALL STREET SYSTEMS, INC., Plaintiff, -v- RICARDO P. LEMENCE, Defendant. | 04 Civ. 5299 (JSR) |
| RICARDO P. LEMENCE, Third-Party Plaintiff, -v- LUCIEN KNEIP, JOSEPH A. PATRINA, J. WATKINS STROUSS, and JAMES M. PATRINA, Third-Party Defendants. | MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.

Plaintiff Wall Street Systems, Inc. ("WSS") seeks a declaration of the amounts it owes defendant Ricardo P. Lemence for salary, incentive compensation, dividends, and disability insurance premium payments for the years 2001, 2002, and 2003. Lemence, in addition to disputing the amounts WSS claims it owes, alleges that WSS breached its contract with Lemence by not paying Lemence the amounts he claims he was owed. He further claims that third-party defendants Lucien Kneip, Joseph A. Patrina, J. Watkins Strouss, and James M. Patrina (collectively, the "Board") breached their fiduciary duty to Lemence. See Defendant's First Answer, Counterclaims and Third Party Complaint and Verified Shareholder's Derivative Third

Party Complaint ("Am. Countercls.") ¶¶ 110-128.[1] Following discovery, plaintiff and defendant both moved for summary judgment. By Order dated June 22, 2005, the Court denied defendant's motion in all respects and granted plaintiff's motion in some, but not all, respects. This Memorandum Order reconfirms those rulings and sets forth the reasons therefor.

The following facts are supported by competent evidence of record and either are admitted or are not genuinely disputed by any competent evidence to the contrary.

WSS is a software technology company formed in 1986 by Kneip, Joseph Patrina, Jeffrey A. Lambert, and defendant Lemence (the "Founding Shareholders"). See Declaration of Lucien Kneip, January 28, 2005 ("Kneip Decl.") ¶¶ 2-4. Lemence, a computer programmer, held the title of Vice President. See Declaration of Mary Ann Lemence, dated February 10, 2005 ("Lemence Decl."), ¶ 3. On or about December 29, 1993, the Founding Shareholders entered into the Wall Street Systems, Inc. Shareholders' Agreement (the "Shareholders' Agreement"), which replaced earlier agreements among them and which provided, inter alia, for an automatic 10% increase each year in the Founding Members' salaries. See Kneip Decl. ¶ 6; Wall Street Systems Shareholders' Agreement, December 29, 1993, § 2(b), attached as Exhibit A to Kneip Decl. (Shareholders' Agreement).

---

[1] Lemence originally asserted six other claims against the plaintiff and the third-party defendants, but these were dismissed by the Court. See Order dated November 30, 2004 and Memorandum Order dated February 7, 2005.

Specifically, section 2(b) of the Shareholders' Agreement provides as follows:

> During the period that the Founding Officers are employed by the Corporation as officers, the Corporation has paid to the respective Founding Officers, as compensation for their services to the Corporation, the base salaries per annum set forth below (which were effective in calendar year 1988):
>
> | | |
> |---|---|
> | Kneip | $132,000 |
> | Patrina | $132,000 |
> | Lampert | $121,000 |
> | Lemence | $110,000 |
>
> Each of the foregoing base salaries has been and shall continue to be automatically increased 10% per annum.

Shareholders' Agreement § 2(b).

Additionally, section 2(c) of the Shareholders' Agreement provides for certain additional, incentive compensation, as follows:

> During the period that the Founding Officers are employed by the Corporation as officers, the Corporation shall pay to the respective Founding Officers, as incentive compensation for their services to the Corporation, bonuses per fiscal year of the Corporation as set forth below in respect of the Combined Earnings (as defined in Paragraph 9(a)(II) below) of the Corporation and each Affiliate.
>
> | | |
> |---|---|
> | Kneip | 10% of the Combined Earnings in such fiscal year |
> | Patrina | 10% of the Combined Earnings in such fiscal year |
> | Lampert | 5% of the Combined Earnings in such fiscal year |
> | Lemence | 5% of the Combined Earnings in such fiscal year |
>
> The amount of such bonuses, the dates of payment thereof and the amount of Combined Earnings pursuant to this Paragraph 2(c) shall be determined by the Board in its sole discretion.

Shareholders' Agreement § 2(c).

Finally, section 2(f) of the Shareholders' Agreement provides as follows:

> Termination of Employment. In the event of the Permanent Disability[2] of any Founding Officer, the Corporation shall continue to pay such Founding Officer all compensation due to him hereunder up to the date of his termination, less any amount received by such Founding Officer under disability income insurance maintained by [WSS].

Id. § 2(f).

In or around the summer of 2000, the tech "bubble" burst, and, whether for this reason or otherwise, on May 14, 2001 the Board and the Founding Shareholders (including defendant) executed a Unanimous Joint Written Consent (the "May 2001 Consent") that amended the foregoing provisions of the Shareholders' Agreement as follows:

> RESOLVED, that the Shareholders agree that the Board, in its sole discretion, shall determine to pay or not to pay, or to accrue or reverse the accrual of, salaries for the Shareholders for all or part of 2001, and, if the Board determines to pay or accrue Shareholders' salaries for all or a part of 2001, the Company shall pay or accrue such salaries, as the case may be, as to all (but not less than all) the Shareholders at the same respective annual salary amounts paid to the Shareholders in 2000. . . .

[2] Section 2(f) of the Shareholders' Agreement states that the term "Permanent Disability" "shall be defined hereunder in the same manner as such term . . . is defined in the Corporation's buy-out disability insurance policy then in effect, unless the Corporation has no such insurance then in effect, in which event such term shall be defined as an illness or other incapacity which renders such Founding Officer completely unable of performing the services for the Corporation contemplated hereby for a period of twelve consecutive months."

> RESOLVED, that during the time period that the Company shall not be paying or accruing Shareholders' salaries as aforesaid, the company shall not pay or accrue any incentive compensation, stock bonuses or dividends for or to the shareholders with respect to such time period.
>
> The Shareholders' Agreement in this Written Consent with respect to incentive compensation and salaries shall be deemed to be amendments to the Shareholders' Agreement dated as of December 29, 1993 by and among the Shareholders and [WSS] . . . .

Unanimous Joint Written Consent of the Board of Directors and Shareholders of Wall Street Systems, Inc., May 14, 2001) (May 2001 Consent) at 3, attached as Exhibit B to Kneip Decl.

Pursuant to the May 2001 Consent, the Board ultimately determined not to increase 2001 salaries for the Founding Shareholders above their 2000 levels, and, moreover, to authorize such salaries only for three of the four quarters of 2001. These determinations were implemented by a Unanimous Joint Written Consent of the Board of Directors dated January 30, 2002 (the "January 2002 Consent"), which allocated 2001 salaries and incentive compensation for the Founding Shareholders as follows:

<u>Salary for 2001</u>:

| | |
|---|---|
| Kneip | $484,804.70 |
| Patrina | $484,804.70 |
| Lampert | $440,797.40 |
| Lemence | $400,593.20. |

<u>Incentive Compensation for 2001</u>:

| | |
|---|---|
| Kneip | $379,666.00 |
| Patrina | $379,666.00 |
| Lampert | $189,834.00 |
| Lemence | $189,834.00 |

See Unanimous Joint Written Consent of the Board of Directors of Wall Street Systems, Inc., January 30, 2002 (January 2002 Consent), attached as Exhibit C to Kneip Decl. The January 2002 Consent also authorized the Board, in its discretion, either to pay these amounts or to accrue them, in whole or in part. Id.

In regard to Lemence, while WSS had already paid Lemence $141,667 of his 2001 incentive compensation in December 2001, he was not paid the remaining $48,167 of his 2001 incentive compensation, nor any of his $400,593.20 in 2001 salary, until 2003. See Kneip Decl. ¶¶ 31-32. The reason for the delay is disputed: Lemence claims it was because the Board wanted to renegotiate the Founding Shareholders' salaries, see Defendant's Memorandum in Support of Defendant's Motion for Partial Summary Judgment ("Def. Mem.") at 7, while WSS claims it was because the company, in order to make itself more attractive to outside investors by increasing its cash reserves, decided to accrue, rather than pay, various of the payments otherwise due the Founding Shareholders, see Kneip Decl. ¶ 20. What is not disputed, however, is that WSS did not make any salary payments to any of the other Founding Shareholders (i.e., other than Lemence) for the years 2002, 2003, and 2004. See Kneip Decl. ¶ 42.

Lemence's case was different, however, because, in October 2002, Lemence, then age 49, suffered a serious stroke that left him permanently disabled. See Lemence Decl. ¶ 6. Under the terms of the Shareholders Agreement and the company's disability insurance policy, the company remained liable to Lemence for his full salary, less certain disability insurance benefits, until October 2004, when he

would be deemed permanently disabled, terminated, and eligible to have his shares purchased by WSS. See Shareholders' Agreement §§ 2(f), 5(a); Deposition of Lucien Kneip, December 14, 2004, at 49.

As a consequence, WSS, after receiving a letter from Lemence's attorney in March 2003, paid Lemence his 2001 salary and his remaining 2001 incentive compensation. Kneip Decl. ¶¶ 31-32; Letter of Melissa L. Jolivet, Esq. to Messrs. Kneip, Patrina, and Lampert dated March 17, 2003, attached as Exhibit 3 to Am. Countercls. There then ensued a series of unsuccessful negotiations between Lemence and WSS, which ultimately culminated with WSS' making the following additional salary payments to Lemence: $440,653 in salary for 2002 (computed by adding 10% to his 2001 salary of $400,593.20); $103,782 in salary for 2003 (computed by adding 10% to his 2002 salary and then subtracting the amount of disability income Lemence received in 2003); and $48,279, for 2004 (computed by adding 10% to his 2003 salary, pro-rating it through the date of his termination, and then subtracting the amount of disability income received in 2004). See Kneip Decl. ¶¶ 40-41.

In addition, throughout this period, two disability insurance policies were maintained on behalf of Lemence, one an individual insurance policy and the other a group policy. See Id. ¶¶ 46, 50-51. Under these policies, Lemence received $223,000 in net insurance payments for calendar year 2003 and $215,903 in net insurance payments for the period from January 2004 through October 12, 2004 (the date of his termination). See id. ¶ 51.

Finally, in December 2001, WSS paid its Founding Shareholders (including Lemence) a dividend previously declared for 1999 but not previously distributed. See id. ¶ 60. Further, on January 7, 2003, the Board declared two additional dividends, one for $1 million authorized on April 3, 2002 and the other for $3 million authorized on December 23, 2002, for a total of $4 million. See Unanimous Written Consent of the Board of Directors of Wall Street Systems, Inc., January 7, 2003, attached at Exhibit D to Kneip Decl. Two million dollars of this $4 million was distributed to the Founding Shareholders (including Lemence)in February and March 2003 and the remaining two million dollars was distributed to the Founding Shareholders (including Lemence) between August and October 2003. See Kneip Decl. ¶ 65. (In December 2003, the Board declared an additional $1 million dividend that, as of the time these motions were submitted, had not yet been distributed to anyone. See id. ¶ 62.)

Against this background, the Court turns to the summary judgment motions. While the motion papers are filled with appeals to equity, the primary issue is simply one of contract law: has WSS paid Lemence what he is contractually owed, or not? The Court considers this issue, first, as to salary, then as to incentive compensation, then as to dividends, and finally as to disability insurance payments.

1. Disputes over Salary. On its face, the May 2001 Consent, to which Lemence consented, gives the Board the power to alter 2001 salaries from those calculated under the Shareholders Agreement.

Lemence argues, however, that it did not give the Board the power to reduce the salaries to those authorized by the January 2002 Consent, whereas WSS argues that it not only authorized those reductions but also created a new, reduced base upon which salaries in subsequent years now had to be calculated.

As to Lemence's argument, it takes two forms. Lemence first argues that, because the May 2001 Consent uses the term "salaries," and not "base salaries" (the term used in the Shareholders' Agreement), it does not give the Board authority to reduce 2001 salaries below what the Shareholders Agreement would otherwise fix as the base salaries, which, in Lemence's case, would be $587,512.20 (i.e., 10% more his base salary for 2000), rather than the $400,593.20 he actually received. This argument presupposes, however, that, instead of using the term "salaries" as a generic term encompassing any and all subsets (such as "base salaries"), the drafters of the May 2001 Consent tacitly intended the word "salaries" to actually mean "salaries that are no less than the base salaries." No reasonable reader, however, could give this strained interpretation to the word "salaries" in the May 2001 Consent, not only because such an interpretation would substitute an artificial and contrived meaning of "salaries" for its plain and ordinary meaning, but also because, since the Consent specifies other limits on the Board's powers to reduce salaries, it is unreasonable to suppose that the May 2001 Consent would not have also specified this base limitation if the parties had so intended.

Lemence’s fall-back argument is slightly more colorable. He argues that, even if the May 2001 Consent authorized the Board to reduce salaries below what the “base salary” provision of the Shareholders Agreement would otherwise provide, it did not authorize the Board to reduce salaries below the absolute salaries paid in 2000 (which was still more than what the January 2002 Consent authorized for the 2001 salaries), because the May 2001 Consent states that “if the Board determines to pay or accrue Shareholders’ salaries for all or a part of 2001, the Company shall pay or accrue such salaries, as the case may be, as to all (but not less than all) of the Shareholders at the same respective annual salary amounts paid to the Shareholders in 2000. . . .”

Lemence’s argument, however, ignores a critical part of this language, i.e., “all or part of 2001.” What the Board actually decided, in the January 2002 Consent, was to pay the Founding Shareholders at the same quarterly rate as in 2000, but for only three of the four quarters of 2001. To suggest, as Lemence does, that this was forbidden to them by the above-quoted language would be to deprive the word “part” of any independent meaning. It is a cardinal principle of contractual interpretation that every word must be given meaning unless the context clearly dictates otherwise. Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 140 (2d Cir. 2000). Accordingly, Lemence’s interpretation, which would render the word “part” nugatory, must be rejected.

While the May 2001 Consent therefore authorized the Board to reduce defendant’s 2001 salary to $400,593.20, its implications for

the years thereafter is far less clear. Since the May 2001 Consent recites that it "shall be deemed to be amendments to the Shareholders Agreement" with "respect to incentive compensation and salaries," WSS argues that the result is that the new Lemence salary that the May 2001 Consent permitted, and that the January 2002 Consent fixed, became a new base, upon which the base salary calculation mandated by the Shareholders Agreement would thereafter be calculated. Lemence, by contrast, argues that the May 2001 Consent authorized, at most, a one-time special reduction, and that the calculations of a base salary that began with the execution of the Shareholders' Agreement in 1993 should be deemed to have otherwise continued, resulting in much higher salaries for the years 2002, 2003, and 2004 than Lemence was actually paid.

While the Court agrees that the May 2001 Consent must be read together with the Shareholders Agreement, the two, when read in tandem, do not clearly resolve which of these two positions is correct. Because, rather, the agreements are ambiguous on this issue, resort must be had to extrinsic evidence; but the extrinsic evidence offered by the parties on these motions only serves to make clear that what we have here is a genuine dispute of fact that can only be resolved by a trial.

2. Disputes Over Incentive Compensation. To date, no incentive compensation has been authorized or paid for 2002 or 2003 to any Founding Shareholder, so the question of the amount of incentive compensation, if any, owed to Lemence for those years is not before the Court. In addition, it is undisputed that WSS lost

money in 2004, so, under the terms of the Shareholders' Agreement, no incentive compensation will ever be owed or due to any Founding Shareholder for that year. See Kneip Decl. ¶ 43. Therefore, the only dispute over incentive compensation that is presently before the Court relates to 2001.

Specifically, Lemence contends that the second "Resolved" paragraph of the May 2001 Consent requires that the Board pay all salaries in full -- i.e., as called for by the original Shareholders' Agreement -- before any incentive compensation is paid. Therefore, he argues, by paying incentive compensation for 2001 without first paying Lemence his full salary for 2001, WSS breached the Shareholders' Agreement. Defendant's reading of the May 2001 Consent, however, is once again contrived.

The Shareholders' Agreement sets a schedule for incentive compensation whereby the Board, in its sole discretion, is to pay Lemence 5% of the Combined Earnings of the Company per year. See Shareholders' Agreement § 2(c). The May 2001 Consent amended that incentive compensation schedule such that WSS was not to "pay or accrue any incentive compensation, stock bonuses, or dividends for or to the Shareholders with respect to" the "time period that the Company shall not be paying or accruing Shareholders' salaries as aforesaid." May 2001 Consent at 3. The only reasonable reading of this language is to prohibit the Board from paying the Founding Shareholders incentive compensation at levels commensurate with full-year salary levels when the Board has decided not to pay full-year salaries, and to mandate, instead, that the reductions be

correlative, so that if salary is only paid for three quarters of the year, only 75% of the corresponding incentive compensation for that year should be paid.

Since, as determined above, WSS, pursuant to the May 2001 Consent, properly paid Lemence, as his 2001 salary, an amount equal to three-quarters of his 2000 salary, therefore, under the foregoing terms, he was only entitled to three-quarters of 5% of WSS' Combined Earnings in incentive compensation for 2001. This works out to $189,834, i.e., the amount he has already received as 2001 incentive compensation.

3. Disputes Over Dividend Payments. Lemence also argues that WSS breached the Shareholders' Agreement by distributing a dividend in 2001 to all the Founding Shareholders when WSS had not paid Lemence his full 2001 salary and when the May 2001 Consent forbade the paying of any dividends when salaries were not being paid in full or were being accrued. Defendant's argument is meritless, however, as it is uncontroverted that the dividend paid to the Founding Shareholders in 2001 had been previously declared and accrued with respect to 1999, whereas the dividends forbidden by the May 2001 Consent were dividends relating to 2001. See Kneip Decl. ¶¶ 59-60. Therefore, whether Lemence was or was not fully paid in 2001 had no bearing on the Board's decision to pay a previously declared and accrued dividend.

As for Lemence's suggestion that the dividends authorized in 2002 and paid to the Founding Shareholders in 2003 somehow also violated the May 2001 Consent, this is inconsistent with his own

argument elsewhere that the May 2001 Consent only relates to payments for 2001. Moreover, while, as noted supra, there is language in the May 2001 Consent that, as plaintiff contends, might make it arguably relevant to post-2001 calculations, that language is expressly limited to "incentive compensation and salaries," and does not affect the Board's power to declare dividends pursuant to the Shareholders' Agreement. More generally, as this Court has previously held in this case,"[t]he shift from paying salaries to paying dividend was, on its face, a classic business judgment issue for a closed corporation like WSS." See Memorandum Order dated February 7, 2005.

4. Disputes Over Disability Insurance Payments. In determining what salary to pay Lemence for 2003 and 2004, effect had to be given to the provision of § 2(f) of the Shareholders' Agreement that states that any permanently disabled Founding Shareholder shall continue to be paid "all compensation due to him hereunder up to the date of his termination, less any amount received by such [Founding Shareholder] under any disability income insurance maintained by [WSS]." Shareholders' Agreement § 2(f).[3]

[3] Lemence argues that it was he, not WSS, who "maintained" the two policies under which he received benefits because the premiums were deducted from his salary. See Def. Mem. at 20-21; Defendant's Reply Memorandum in Support of Defendant's Motion for Partial Summary Judgment at 10. But it is undisputed that WSS obtained, renewed, and fully processed the policies here at issue, which is more than sufficient to meet the ordinary meaning of the word "maintained." Furthermore, the obvious intent of the set-off provision is to avoid a disabled employee's receiving more income than he would receive if he were not disabled, a purpose that would fail if Lemence's interpretation of "maintained" were accepted.

While § 2(f) is silent with respect to whether "compensation" refers to "gross compensation" (i.e., income before taxes) or "net compensation" (i.e., income after taxes), the language at least makes clear that the parties intended to make a disabled Founding Shareholder financially whole -- that is put him in the same position with respect to compensation that he would be in if he had not become permanently disabled and had continued to work -- but not give him a windfall. Since the insurance benefits received by Lemence were paid to him in after-tax dollars (WSS having paid the taxes), WSS calculated what amount of salary Lemence would have had to earn in order to receive, before taxes, the equivalent of what he received in after-tax insurance benefits, and then deducted this amount from the total salary due, and paid Lemence the difference. See Kneip Decl. ¶¶ 44-56. While Lemence claims that, instead, WSS should have simply deducted the after-tax benefits he received (as opposed to the "grossed up" amount), this approach would have led to the bizarre result that Lemence would have been entitled to more compensation from WSS after becoming disabled than while actively working. Accordingly, WSS' approach was proper under § 2(f).

The effect of the foregoing rulings of contract law is to grant plaintiff's motion for summary judgment, with respect to its request for a declaration that it has paid Lemence all he is owed by WSS, in every respect except as to salary payments for the years 2002, 2003, and 2004, as to which trial issues remain. By the same token, plaintiff's motion for summary judgment dismissing defendant's breach of contract claim is likewise granted except as to the alleged

failure to pay the requisite salary for those three years. Finally, defendant's motion for summary judgment in its favor on its breach of contract claim is denied in all respects.

These contract issues aside, the parties have also moved for summary judgment in their respective favors on defendant's only remaining non-contractual claim, i.e., his claim that the third-party defendants, constituting the WSS Board of Directors, breached their fiduciary duties to plaintiff in his roles as employee and shareholder of WSS. See Am. Countercls. ¶¶ 120-21. Among other things, this claim alleges that the Directors breached their fiduciary duty to Lemence by (1) reducing his salary for 2001 in violation of the Shareholders' Agreement as amended by the May 2001 Consent (¶¶ 122-24), (2) delaying payment of the salaries and dividends (¶¶ 127-28), (3) visiting defendant's home unannounced, after he became disabled, in an effort to secure his agreement to the reduction of his 2002 salary and the like (¶ 125), and (4) making false representations regarding the need to reduce salaries for the alleged investor presentations (¶ 126).[4]

This claim is governed by Delaware law. See Memorandum Order dated February 8, 2005; see also Galef v. Alexander, 615 F.2d 51, 58 (2d Cir. 1980) (New York courts consistently apply the internal affairs doctrine and "look to the law of the state of incorporation

---

[4] Certain additional breaches of fiduciary duty alleged by Lemence against the Directors require no discussion here, since, on summary judgment, Lemence was unable to adduce any competent evidence to support them even in response to the competent evidence adduced by the third-party defendants contradicting these assertions.

in adjudicating a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and its directors."). Under Delaware law, a shareholder of a closely held corporation who is also an employee cannot recover for breach of fiduciary duty where the claim is essentially an employment dispute. See Riblet Prod. Corp. v. Nagy, 683 A.2d 37, 39-40 (1996) (holding that in a closely held corporation, a majority shareholder does not have a fiduciary duty to a minority shareholder who is also an employee when the dispute arises solely with respect to an employment contract); see also Ibar v. Field, 97 Civ. 5211, 1999 WL 461815, at *5 (S.D.N.Y. July 6, 1999). Here, all of Lemence's claims of breach of fiduciary duty reduce to disputes over what he was due by way of salary and incentive compensation. As such, they are essentially employment disputes that cannot sustain a claim of fiduciary breach under Delaware law. As a result, summary judgment must be granted in favor of the third-party defendants, and denied to Lemence, on the fiduciary breach claim.[5]

Accordingly, for the foregoing reasons, the Court hereby reconfirms its earlier rulings set forth in its short-form Order dated June 22, 2005. As previously scheduled, the parties are

---

[5] It may also be noted that, even if defendant had a cognizable claim under Delaware law, most or all of his allegations of breach of fiduciary duty would be barred by the so-called "Business Judgment Rule." See generally, Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993) (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)); In re Walt Disney Co. Derivative Litig., C. A. No. 15452, 2005 Del. Ch. LEXIS 113, at *150 (Del. Ch. Aug. 9, 2005).

directed to report at 9 a.m. on November 14, 2005 to Courtroom 14-B at 500 Pearl St., New York, NY to try the sole remaining issues of the amounts of salary owed Lemence for the years 2002, 2003, and 2004.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
September 1, 2005